Good morning. The next case on this morning's docket is the case of Michael Young as father and ex-best friend of Zachary Young, a minor, versus Mark Reiman and Marilyn Reiman. We have Paula Newcomb for the appellant and Joseph Blier for the appellee. And you may begin, Ms. Newcomb. Thank you. Paula Newcomb, I'm returning for Michael Young as father of Zachary Young, a minor. I would like to appeal from the denial of a verdict for the plaintiff in Jackson County Circuit Court. This is probably a refreshing, simplified issue for the court. After airing a lengthy, complicated case this morning, it was a dog bite. The child was five when bitten, not when he went to trial. Filed a complaint alleging common law negligence or strict liability for the bite of the dog. We were set for a jury trial that morning. We appeared for jury trial in the defendant waived jury. The plaintiff had not requested a jury, so we proceeded on to a bench trial. We believe that the verdict and the order that was entered is against the manifest way of the evidence and that it should be reversed and retried on the issue of damages. And I have looked at it, and the defendant puts a lot of weight on the issue of waiver, that the lower court or this court cannot consider the Animal Control Act, the strict liability Animal Control Act. But in this particular case, it doesn't matter. I will tell you that we appeared that morning for jury trial with an amended complaint, jury instructions for the Animal Control Act. But after we went to a bench trial, I didn't think it was necessary to do that, because the court, as a matter of fact, has a duty to look at the relevant law according to the facts of the case. But even if this court finds that... Okay, just a minute, just a minute. You did not file a cause of action under the Animal Control Act? That's right. And you're saying that even though you didn't file a cause of action under the Animal Control Act, that the trial judge is supposed to act like you did? I think that the trial judge has the discretion to do that. Is he required to do so? No. Can he do so? Can the trial judge choose an alternative theory? I think that he can look at the relevant law applicable to this kind of an action, and I believe that he did have the discretion to do that if he chose to. He did not. He did not. He did not have to. I do not disagree with that. And I'm not asking... So he didn't abuse his discretion? On that issue. I do not disagree with that. But in this case, it doesn't matter, because the Animal Control Act codified somewhat the common law theory of the dog bite or dangerous animal case. But what it did do was eliminate the knowledge requirement, or essentially lessened it. Some cases will say that it eliminated the duty requirement. But nevertheless, it is a much lower burden under the Animal Control Act, and I understand that. But even under the way we've led this, there should have been a verdict for the plaintiff. I'm not trying to beat a dead horse here, okay? But one of the issues in your brief is you say the trial judge had a duty to take knowledge of other relevant law in this area and apply the statutory law accordingly, specifically the Animal Control Act. Are you now, in this oral argument, abandoning that issue? I think I will do that. Okay, go ahead. All right, because I do believe after reading Mr. Blyer's brief, I think it's a better position, but I still believe under the negligence theory that we maintain there should have been a verdict for the plaintiff. Okay, so it really is whether or not the trial judge's decision was against the manifest way to the evidence. Right. Okay. Under the complaint, we put that they knew or had reason to know the dog might bite a young child such as Zachary Young, failed to have the dog contained or on a leash, failed to properly supervise and monitor the dog, failed to warn Zachary Young that the dog had been seen by persons. Four different allegations of negligence. And under the Common Law Strict Liability Act, proving that the plaintiff had the knowledge, had knew or had reason to know that the dog had dangerous propensity is sufficient to sustain that cause of action. So there were three different areas of proof that were brought out in the testimony. On page 8 of the brief, Ms. Ryman, who is the lady who lived at the residence, the defendant, Mr. and Mrs. Ryman, she testified that, or Felina Young, and that is the mother of the minor, testified that Mrs. Ryman had told her, and she did not rebut this, that Brad Hill had treated the dog aggressively, grabbing its nose and mouth and keeping it together, and the dog became aggressive that way. Mrs. Ryman testified that the grandchild told her that Daddy plays too rough with Jack. And then the question went on that, so she took possession of the dog from Mr. Hill. Mr. Hill is the man with the three children. I'm hot because the dog was becoming aggressive. So it had previously lived in Brad Hill's home. That's the first set of testimony that goes to Ms. Ryman and Mr. Ryman's knowledge about the dog's aggressive tendencies. The second one, I had no idea, but I later discovered the dog had also bit Mark Ryman before it bit Zachary. Ms. Young testified that Ms. Ryman had told her it was severe, a bloody skin, open bite, and all these things happened before the dog bit Zachary Young. Mr. Ryman confirmed the dog had bit him and stated that, yeah, stabbed him, yeah. The third instance of prior knowledge to the defendant was on the trip over there, Zachary Young testified that one of the other children, belonging to Brad Hill, Brad Hill was the son of the Ryman's, the defendant. He was dating Felina Young. Brad Hill had three children. Felina Young had two children. I think I have the count right. All these children were going there with these two people for Thanksgiving dinner, but on the trip over, Zachary Young said, Brad Brady Hill told him on the way over, that dog might bite, so don't pet him or anything. Zachary went on to say, I didn't think he was telling the truth or anything. He said no grown-up had told him anything about the dog. There are some other things. I have put in the motion to consider, which is part of the record, and I didn't put it in the brief, and I want to qualify this statement. We did take this from his deposition, and I don't know if this was in the deposition or the trial, but at any rate, she had indicated that she would keep, had she known they were due to arrive any minute, she would have the dog locked up, and I don't want to represent that's in the record. Perhaps that's only in my deposition, because I did put it in the brief. But I think the three things I just told you about preceding that are sufficient to establish knowledge on the part of this defendant in how you have a dog that you have moved from one home to another because it's aggressive, moved it out of the home where there are children to where there are only adults. It has bitten before, and the grandchild knew that it would bite and towed the minor child who was bitten. So the court's ruling... ..was really short to the point. It says there's no credible evidence that the defendants had actual knowledge of a dangerous propensity on behalf of the dog. And I think that that is dissimilar. It is against the manifest way of the evidence. The evidence is what it is. It was a short, succinct trial. There wasn't a lot of unnecessary testimony. The witnesses... ..the witnesses, I think, on both sides were very credible. Ms Reiner did say at one point that the dog was asleep on the couch, but then on another point in her testimony she said, I thought the dog had gone with my husband to town, and she alluded to... ..indicated she didn't know the dog was there when they were due to come in. But then in the other part of her testimony she said it was sleeping on the couch. So except for that portion of her testimony, which wasn't very credible, I think that the parties... ..but she did deny that she knew the dog had problems before it came to live with her, and, frankly, I just... ..I think that in as far as the rest of the case, the judge did rule that there were no damages proven or that he basically said they had... ..there was no credible evidence. And that's just simply not the case, and the record doesn't reflect that. I think it's also... How did you prove out your damages? The defense stipulated to the use of medical records from the hospital. As to what, the authenticity of the records? Yes. OK. The child testified and the mother testified and the father also. And did the defense stipulate that they could be used to prove damages as well as the authenticity? I don't think there was any distinction made between what they would be used to prove. The proof that they could be vetted into evidence, I don't think there was any ruling... Will that be in the record, that stipulation? I believe it is. OK. I believe it is. We had subpoenaed a nurse, and when the defense, Jamie Nass, I think her name was, and when the nurse, the emergency room nurse, and when he stipulated the use of all that information, we let her cancel her subpoena. But the mother, father, and the child all testified. I think also there's an error in the way the ruling is written. I think it goes a bit farther than the common law strict liability, what the law actually is. It says, in the order, the owner or keeper of a domestic animal is strictly liable for injuries caused by that animal only if the plaintiff can show that the animal had an uncommon, dangerous propensity to commit such an injury and the owner had actual knowledge of that propensity. The court cites Don v. Hollenbeck, a 1988 Fourth District case. In order to tie down exactly what the required amount of evidence was in this case, I looked at the jury instructions, which are the most succinct analysis. I have those available. The instruction, 110.04 IPI, says this regards Animal Control Act, which, of course, I'm saying I'm not pushing. So wait a second, then. How could you give an instruction related to the Animal Control Act, which you've now even abandoned on your argument? I'm just saying this part of the IPI says that that instruction can be given in the alternative with an action under the common law. That's what I was getting to, was just the common law instruction. I'm sorry. That's okay. Okay, the common law instruction is cited as IPI 110.02, Section 88.01. It says one who keeps or owns an animal, which he knows is vicious or dangerous to people, is liable to a person injured by the animal. And then it has the provocation clause you put in, unless the reason person should have known his conduct would provoke the animal. And that's essentially the common law instruction. So I think that what the court's finding... The court went on to say it had an uncommon dangerous propensity. And that is not required, that the animal have an uncommon dangerous propensity. It does say in this instruction that it have a vicious or dangerous to people requirement. I don't know what uncommon means and just how vicious the dog has to be. Apparently the judge then cites two cases. Do we know whether or not that may be language taken from those cases? I do not know. I do not know the answer to that. But you're saying that it doesn't comport with... It doesn't comport with IPI. Because you think that he had to write down exactly what IPI states? No. I think that the judge put a larger burden on us for the... By using uncommon rather than vicious. Yeah, the dangerous propensity. I don't think that it has to be anything other than that they knew that it was vicious or dangerous to people. And I think that that's what the law holds. There is a more recent case, 96 case, that follows the comments of this IPI, Eyring v. Johnson. So I think that for a couple different reasons, that the ruling, that the order, the requirement of law, the duty that the judge placed on us in the bench trial for this common law strict liability theory was too great. According to the ruling, it doesn't exactly track the common law strict liability theory that is recognized in Illinois. And secondly, there simply was a lot of facts proven, three different separate elements of testimony in this record by different witnesses that established that this dog was a violent and that he was a dangerous dog. And I believe that the verdict is against the manifest way of the evidence and should be remanded for review of damages on this case at bench trial setting. Thank you. Thank you, Ms. McCormick. And you'll have the opportunity for a rebuttal. Mr. Blyer. Good morning, Your Honor. May I please record? Good morning. Joe Blyer. I'm here for Mr. and Mrs. Ryman, and we're asking does this honorable court affirm Judge Kimball's ruling or judgment in favor of the defendants? I'm sure counsel has abandoned her argument or not regarding the- I think you can rest assured that she did. We took it that way, and you can abandon it yourself here. Well, I'm a little reluctant to abandon anything in front of this court, but I guess I will. The issue then becomes whether or not Judge Kimball's ruling or judgment was against the manifest way of the evidence. And this court, to reverse Judge Kimball, must find that his decision was arbitrary or not based upon the evidence or unreasonable. And I think Judge Kimball's ruling or his judgment is very concise and is clear in the fact that he was the trial judge and that he was there waiting all of the evidence and the testimony going both ways from all the witnesses. I noticed Ms. Newcomb said that it was a lengthy and complicated process. If I recall, I think we appeared that morning at 9 o'clock for a jury trial. I waived the jury trial. We had some argument. We put on the evidence and argued the case, and we're out of the courtroom by 11 o'clock that morning. And I think the court can determine that from the length of the record. Justice Chapman, you asked a question about a stipulation on the damages that she had. I don't believe there's anything in the record in that regard. I've tried cases in front of the other jurors here. What would have happened, we would have, and I'm not going to stand in her way about the records going in. I do it routinely. I don't have to call someone to stipulate basically to the foundation that she can offer the records for whatever they're worth without having someone come in to testify that these records were made at her near the time of the events therein. And likewise, with the bills that were offered, I wasn't going to make her go take a billing clerk or someone to that extent from the hospital to come in and just sit there. So what you're talking about is authenticity, then? That's correct, Your Honor. I mean, we let the bills and the records come in without her having to call someone to authenticate the bills or to basically foundation them. And that's what I've done in other cases, and that's what we would have done in this case. And to be honest about it, I don't know if that would have been excellent on the record, but that certainly, I would stand here before the court to say that if it's not on the record, that's what we would have done at the time of this trial. You would not dispute that there was some evidence of prior bites in the record? I do dispute it to this extent. And I guess in this type of case, what's the definition of a bite? And I think that's why we have to give deference to Judge Kimball because I think there's testimony, and the testimony was, if you read to it, the mark, the son, Brad, who had the dog before he gave it to his mother and his stepfather, he would roughhouse with it, grab it by the snout, and at the time that the plaintiff wants to talk about that the dog had his first bite, I think Brad was playing with it, and the testimony was that he was roughhousing with it and the tooth of the dog house caused a cut to his hand as he was roughhousing with it. I think there was no testimony to the extent that this dog had a previous episode where it bit a child or bit someone to the extent that it did at this time. There was testimony, Judge Kimball weighed that, about Brad having it before, roughhousing it, and then nipping him, you know, I'm familiar with, you know, you roughhouse with a dog, you grab it by the mouth, and it's got teeth and your hand is dull, and sometimes the hand loses out. I think that's why we must give deference to Judge Kimball in this particular case. I notice he used in his order the phrase, no credible evidence. That's one of those magic words when you're doing a bench trial. And so he acknowledged that there was some dangers, or some prior incidents, but that there was no dangerous propensity. That's my understanding, and I think that's correct, because there was testimony that Brad had suffered a cut or a bite previously, and I think that's why the order, and I think it may not be up to the judge not to sit on the bench trial, but Judge Kimball weighed the evidence and determined that there was no credible evidence in favor of the claim in this particular case of any prior. The owner knew or should have known that Jack had a potential to inflict injuries on this particular young child. And I think if you read the record of the evidence, I mean, the dog was undoubtedly at the home. It's kind of a split-level house. The dog was sitting on top of the stairs. There's controversy testimony as to whether or not Sissy, which was the young man's dog, mother's dog, brought. It was running around, and this young man, Zack, came up the steps behind the dog and attempted to pet it, touch it, whatever it did. There's no question it snapped its hand, but I think under the common law set forth in the Forsyth-Duggar case and the Doan v. Holenbeck case that Judge Kimball cites, and both in the pertinent portion of that opinion, that case is set forth on page 8 of our brief, and I think that Judge Kimball, being the gatekeeper, so to speak, at a bench trial, listened to all the evidence from both sides and found that based upon the evidence presented to him at the time of the bench trial, that there was no credible evidence to find under the common law statute in favor of the plan. What do you have to say about Ms. Newcomb's remark about the uncommon use of that word in his order? The judge stated that the animal had an uncommon dangerous propensity, and I think she's arguing that's a higher burden. I'm not sure why Judge Kimball used that the animal had an uncommon dangerous propensity, but I think if you read the two cases that he cites after that passage, and that's the portion I said on page 8, that I don't believe Judge Kimball was trying to expand the law or expand the common law of duty of the owner of the dog in using the phrase uncommon dangerous propensity. And looking at the side I put forth in the case, I will admit to this court that the word uncommon doesn't appear to be in sight, but I believe based upon the facts of the case, reading those two cases, that Judge Kimball's decision is certainly not arbitrary and it's based upon the evidence and certainly is not unreasonable given the circumstances of the evidence presented to him there at the time of the bench trial. You don't think he was saying that common dangerous propensity is okay? I'm sorry? You don't think he was saying that common dangerous propensity is okay? I don't believe so. I don't believe so. Well, he did mix words up there, though. He did talk about, or I mean the Forsyth case talked about mischievous propensity, not dangerous propensity. The animal had a mischievous propensity to commit an injury. That is correct. I will agree, I'm hesitant to agree to something with Judge Kimball because I'm wanting this Court to affirm it. But I believe based upon, if you read the totality of his order and the totality of those two cases, I think this Court certainly, there's enough there to sustain or affirm his judgment entered in favor of the defendant. Let me ask one other question. I don't know that it was in the briefs, but I think Ms. Newcomb today said that she did try to amend her complaint and add the Animal Control Act as an account. Your Honor, I have made it known that I don't recall any time her seeking leave. In any event, that's not argued. As a matter of fact, my partner, Rocky, who helped me on this, I spoke to him this morning, and I said, well, I don't think she's ever, even to this day, sought leave of court, this court, trial court, post-trial motion, anything, seeking leave to add the comment to this statutory. And he reminded me that she mentioned in the closing argument, we talked about the statutory, or she talked about the statutory duty and the common law duty, but there was, my recollection of it, there was nothing, never sought leave. Nothing formal at all. Informally, or she spoke, she stated it in her closing argument, but never said I would seek leave to amend. There's like four phrases here we have to balance. Judge Kimmel used two of them. He used dangerous propensity, and then he used uncommon dangerous propensity. Forsyth uses the phrase mischievous propensity, and you use the phrase vicious propensity. So there's four different standards there that... I use vicious propensity. In your brief on page nine. No vicious traits, okay. And your question is? I'm not sure. It's just we're balancing four different propensities here. Well, as I spoke earlier, I'm hesitant to disagree with anything that Judge Kimmel puts before us. I'm asking this article of court to affirm it. But as I spoke earlier, I think we used the word totality. I've never really understood it. I like that word. The totality of the two cases, the totality of the evidence, I think that... And keep in mind, I think Judge Kimmel was the one that had to weigh all the testimony and determine based upon whatever phrase you might use in those four that there was no evidence to support a judgment other than favorable defense. We ask that Judge Kimmel be affirmed. Thank you, Mr. Flier. Mr. Dunkel? Let me ask a question to follow up something Justice Chapman asked. What I heard you say, Ms. Ducombe, was that you took an amended complaint with you but never sought leave to file it. Is that right? Okay. And jury instructions that corroborated that and went along with that complaint. But frankly, I didn't fill that out on the evidence that was presented. It was necessary, and I did not do so. I did make argument about it in the closing. But I did have a couple things. And I think this use of the word uncommon is fairly problematic. And when I sit and think about that, well, an uncommon dangerous propensity. We're not required to prove anything more than they knew or had reason to know that the dog had vicious or dangerous propensity. And I do think there is a difference in the mischievous propensity to bite and the dangerous now. What about, however, I'm looking at your brief, on page 16, you say, had this case gone to jury rather than a bench trial, the following instructions would have been applied. 88.11, liability of owner or keeper of a dog, says unusual and dangerous nature of the animal. Now, could uncommon and unusual be considered somewhat synonymous? Well, I think that's fair reading of that. If we'd use that instruction, though, and if it were the law to apply to this case, but it's not. It's not the law that applies to this theory. But I heard Mr. Blier arguing, and I suspect he probably did in the trial court too, is that it's not unusual or uncommon if you're roughhousing with a dog that you might get a little bite. But that's a misstatement. And so there's a difference between that and the dog biting without provocation. That's true, but that's a misstatement. And couldn't Judge Kimmel have found that? But that's a misstatement of these facts. Okay, okay. The record will show you that Brad Hill and his three children bought the dog, originally had the dog at their home, and the kids and Mrs. Ryman had said that he treated the two roughly, that he played with it, held its jaws closed, and he roughhoused with it. And this was apparently over a period of time that they were raising the dog. And then at some point it became where it had to be moved from their house to the Ryman's house. Now the person that it bit was not Brad Hill that we know about, was not Brad Hill in the roughhousing incident, or plural incident, when he had the dog, you know, raising it in his home, or caring for it, however long that was. But later, after it moved to the Ryman's, it bit Mr. Ryman because it was trying to protect Mrs. Ryman from Mr. Ryman, when they apparently were. Wasn't that disputed, though? I thought there was some different characterization of that. Yeah, they claimed it was just, you know, they were just, you know, kidding around or whatever, and the dog took it as a threat to Mrs. Ryman and bit him. But she described it to Felina as an open, severe, you know, bleeding wound. Then there's the incident where one child told the other child the dog would bite, and that's one of Brad Hill's kids, and he said it would bite. So I think that, you know, we have dogs. I have dogs in my house, and certainly if you play with them, you know, on the floor, and they, you know, do that kind of thing, you can get bitten. But that's different than meeting a person at the door to bite them as they come in the door. And that's what this dog that day did. And I disagree that, you know, the statement of facts that says the dog was just, you know, sitting at the doorway and that the other... There's a dispute about whether or not my client or a client's mother brought a dog. She says she did not bring this dog, Sissy. They say she brought a dog. I think she... But anyway, she says she didn't bring it. That's a pretty big issue, I would think. So, I mean, it seems to me that that may have somewhat set the stage for credibility issues in general if the court had to decide whether or not, in fact, there was another dog in the whole mix. Yeah, yeah. I think she indicated that it was her, like, first visit over there, and she wouldn't have brought her dog there, you know, her boyfriend's mother's house, and not having been an invited guest there many times before. And she said, I just wouldn't have done that. But at any rate, I think there's a dispute about that. But Mrs. Ryman says the dog was sitting there watching that, you know, nothing happened, and then she claimed that the dog was touched on the back by Zachary, who said, hi, puppy. But other parts of her testimony, the statement of facts, Mrs. Ryman was on the deck near the kitchen. See 082 and 083. So either she was in the kitchen by the dog in the doorway or she was on the deck. But she said she was on the deck. Thank you, Ms. Newcomb. Thank you both for your briefs and argument. We'll take the matter under advisement and render ruling in due course. Thank you.